# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
September 20, 2016 Session

## STATE OF TENNESSEE v. RONALD LEVON COSPER

**Appeal from the Criminal Court for Hamilton County**
**No. 285969     Barry A. Steelman, Judge**

———————————

**No. E2016-00212-CCA-R3-CD – Filed May 12, 2017**

———————————

The Defendant, Ronald Levon Cosper, was convicted of first degree felony murder and attempted especially aggravated robbery. *See* T.C.A. §§ 39-13-202(a)(2) (2014) (felony murder), 39-13-403 (2014) (especially aggravated robbery), 39-12-101 (2014) (criminal attempt). He received concurrent sentences of life for the felony murder conviction and ten years for the attempted especially aggravated robbery conviction. On appeal, he contends that (1) the evidence is insufficient to support the convictions and (2) he was deprived of due process because the State introduced unreliable identification evidence of him as the perpetrator of the offenses. We affirm the first degree felony murder judgment of the trial court. We affirm the attempted especially aggravated robbery conviction but vacate the judgment and remand for entry of a corrected judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Convictions of the Criminal Court Affirmed; Case Remanded for Entry of Corrected Judgment**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ALAN E. GLENN, J., joined.

Andrew S. Balser (at trial and on appeal), John Allen Brooks (pretrial), and Paul Bergman III (pretrial), Chattanooga, Tennessee; Ardena Garth (pretrial), District Public Defender, and Mary Ann Green (pretrial) Assistant District Public Defender, for the appellant, Ronald Levon Cosper.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; M. Neal Pinkston, District Attorney General; Lance Pope and Cameron Williams, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

The Defendant's convictions relate to a July 2, 2012 attempted robbery, during which Steve Mosley was fatally shot. At the trial, the Defendant claimed that he was not present when the victim was shot and that no proof existed to show that an attempted robbery occurred.

Chattanooga Police Officer Thomas Seiter testified that he was dispatched to the scene of a shooting on July 2, 2012, at 3:16 p.m. He said that emergency medical personnel and other police officers were already present when he arrived five to ten minutes later. He identified the scene on an aerial map, which was received as an exhibit. He stated that the map depicted an unpaved "cut-through" trail between two houses.

Officer Seiter testified that he interviewed Marquita Swanson and Jameka Price at the scene and that they described the person they had seen running from the scene. He said they described a black male, about 5'9", wearing a turquoise shirt, and having a "low-cut haircut." He identified the crime scene log, which was received as an exhibit.

Marquita Swanson, who lived in the duplex unit next to the one in which the victim lived, testified that the victim had lived in the duplex all his life. She said he was a "[g]reat neighbor," that he was unemployed, that he "sit [sic] in the house," smoked marijuana frequently, gambled, played dominoes, and had family gatherings. She said he did not bother his neighbors. She said that he did not have a car and that he walked or rode his bicycle. She said she did not know if the victim sold marijuana regularly but stated that she previously bought a "blunt" for $5 from his "personal stash."

Ms. Swanson testified that on July 2, 2012, she was home with her infant daughter, two young nieces, and "Mimi." She said she had seen the victim that morning when they were outside smoking. She said that later in the day, she was in her living room and heard loud noises on the walls that sounded like it came from the victim's living room. She had never before heard as much noise come from the victim's unit. She said she went to her porch and noted that no cars or people were in the victim's driveway. She said she looked inside the victim's unit and saw the victim's arm "tussling with" another person. She saw they were tussling with a silver revolver but could not see either person's face. She said the other person's arm was lighter than hers and the victim's but did not know whose arm held the gun. She said she went inside her unit and took the children to the back of the house. She said that as she was about to reenter her unit, she heard about four or five gunshots. She said that after she put the children in the back of her home, she went to her living room and saw the victim, who was holding his chest. She said he moved his hand and showed her a gunshot wound. She did not see blood but saw a hole in his shirt. She said he told her to call his brother, "Red." She said that Mimi had her cell phone at the time and that the victim told her to "go over there and get his phone." She said she told Mimi to go and that while Mimi was gone, the victim took his

last breaths, fell to the floor, and cried.  She said he continued to ask her to call his brother.  She said that when Mimi returned with the victim's cell phone, she called the police.  She did not recall whether the police interviewed her at the scene but stated she and Mimi were interviewed at the police station.  She identified photograph exhibits of the duplex and her living room and a photograph of the victim in the entryway of her home.  Ms. Swanson did not recall talking with the Defendant's mother, Rachel Lee.

Cheryl Billups testified that the victim had been her boyfriend of five years, that she had lived in the victim's neighborhood for about seven years, and that her family had lived there for about fifteen years.  She thought the victim grew up in the neighborhood and said "everybody in the neighborhood loved" him.  She said he went to the store for elderly neighbors and played with neighborhood children.  She identified a "cut" or trail between North Hawthorne Street and Sheridan Avenue, which was depicted in the aerial map previously received as an exhibit and in two photographs that were received as exhibits.

Ms. Billups testified that on July 2, 2012, she was outside her daughter's house talking to neighbors when she heard what sounded like fireworks.  She said she heard screams, children "hollering," and people crying, "Help me, help me."  She then said she heard one person asking for help and that the voice was female.  She saw people running through the trail and a white car pull up.  She said a white man and two black men were in the white car.  She identified Dustin Hayes as the white man and the driver.  She identified Devante Stoudemire as one of the black men and said he sat in the front passenger seat.  She said Mr. Stoudemire had light skin and wore his hair in dreadlocks.  Regarding the other black man, she said, "[O]ne of the guys was Ronald Cosper as I know of today," and she stated that he sat in the passenger side backseat.  She said that the two black men got out of the car and that Mr. Stoudemire came to talk to her.  She said Mr. Stoudemire and her son had gone to school together and had been friends.  She said the Defendant got out of the backseat on the passenger side and "went through the trail."  She said that Mr. Stoudemire asked about her family members and that as they talked, she watched the Defendant on the trail.  She said she continued to hear people yelling.  She said Mr. Stoudemire received a telephone call and that she heard him say, "Yeah, man, yeah, you crazy.  All right.  It's done. . . . Okay."  She said that the Defendant walked to the car, that he nodded to Mr. Stoudemire, and that they got into the car and left.  She said that as they made a turn from Sheridan Avenue to Wilson Street, she heard the emergency and police vehicles arriving.  She thought she had continued to hear the sound that reminded her of fireworks when the Defendant went through the trail.  She said Mr. Stoudemire did not go onto the trail.

Ms. Billups acknowledged that when she talked to defense counsel before the trial, she had not known Mr. Hayes's or the Defendant's names.  She said that the Defendant had worn a "turquoise blue" t-shirt with "designs" and black or navy shorts.  She said that she had described him previously to defense counsel as being 5'3" to 5'8".

Ms. Billups testified that although she had never witnessed the victim's selling marijuana, she was aware he did so. She agreed that on the day of the crimes, she did not know the identity of the black man other than Mr. Stoudemire. She agreed that the police never showed her a photograph lineup. She said she found out the Defendant's name through the legal proceedings.

Michael Mosley, the victim's brother, testified that his nickname was "Red." He said the victim had lived in the duplex since June 1993 and that they had other family in the neighborhood. He said that the unit of the duplex in which the victim lived had been the family home. He said he visited the victim daily and had been at the duplex on July 1, 2012. He said the victim was "mentally retarded," had attended "Orange Grove," and had worked at the "Orange Grove crusher" in the early 1990s. Mr. Mosley said the victim had been unable to read and write but could cook. He said that the victim walked or rode a bicycle and that Mr. Mosley or their other brother drove the victim on occasion. Mr. Mosley acknowledged that the victim smoked marijuana daily and that the victim sold and possessed a small amount of marijuana. He said the victim was childlike and enjoyed video games and junk food.

Mr. Mosley testified that on July 2, 2012, he spoke with the victim around noon. He said the victim was waiting for him to bring a video game after Mr. Mosley finished work that evening. Mr. Mosley said the victim had no enemies and did not do things to "disrespect people or stuff like that."

Mr. Mosley identified photograph exhibits depicting the interior of the victim's home, which included a photograph of an ashtray, "blunts," and a "weed shredder." Another photograph depicted damaged sheetrock, which he described as dented, behind the victim's front door. Mr. Mosley said the damage had not existed the last time he was at the victim's house.

Mr. Mosley said he came to the scene after receiving a telephone call in which the caller informed him that the victim had been shot. He said the victim lay on the floor of the duplex unit next door when he arrived.

Hamilton County Chief Medical Examiner James Metcalfe, M.D., an expert in forensic pathology, testified that he performed the autopsy of the victim's body. He identified his autopsy report, which was received as an exhibit. He said that the victim's cause of death was gunshot wounds of the chest and abdomen and that the manner of death was homicide. He said the victim weighed 133 pounds and was 70.5" tall. He said the victim sustained three gunshots but had five wounds from the gunshots. He said that in addition, the victim had a wound on the left scalp that appeared to be a blunt force injury, which he said caused the scalp to split. Dr. Metcalfe said the victim also had linear abrasions on the back. He agreed that the victim also had abrasions on the hand, elbow, knee, and other areas.

-4-

Dr. Metcalfe identified photographs of the victim, which were received as exhibits. He agreed that one of the photographs depicted an "apparent muzzle mark" related to a chest wound, which he said was a "loose-contact wound" indicating that the gun's muzzle had been in contact with but "not pressed hard" against the skin. He said he found burns from hot powder or soot around the wound, which confirmed that it was a loose-contact wound. Relative to the chest wound, he said that the bullet penetrated the victim's heart, that the injury would have caused rapid internal bleeding, and that the victim "might be able to do something for a minute or two, a few minutes." In Dr. Metcalfe's opinion, the person holding the gun to the victim when the shot to the chest was fired was "within the person's arm's length." Dr. Metcalfe said the shape of the wound indicated the gunshot could have been fired by a semi-automatic handgun, but he could not state with certainty the type of weapon used to inflict the gunshot wounds.

Dr. Metcalfe testified that in his opinion, the head wound resulted from the victim's head hitting "something off vertical." He agreed, though, that the wound was also consistent with the victim's falling and striking his head on the floor. He agreed it could have been consistent with the victim's having been struck with the butt of a gun. He said the head wound appeared to be the same age as the gunshot wounds. Dr. Metcalfe agreed that the linear abrasions on the victim's back could have been consistent with the victim's having fallen into drywall.

Dr. Metcalfe testified that a gunshot wound to the victim's arm included a black, burned area, indicating that the shot had been fired from about one inch from the victim's skin. He said the bullet exited the victim's arm and reentered the body at the chest. He noted a third gunshot wound to the left groin. He said that no black particles or soot existed around the groin wound but that the victim's shirt contained soot and particles that would have been transferred from the third wound if the victim had bent forward. In his opinion, the firearm was one foot or "a little more" from the victim when this gunshot was fired.

Chattanooga Police Homicide Investigator Matthew Puglise testified that he responded to the scene. He said the victim lived on Side A of a duplex but had gone to Side B to get help after being shot. He said that before he went to the scene, he walked the trail on which Ms. Swanson had seen a suspect flee after the shots were fired. He said he notified the crime scene unit of a beer can on the trail. He identified the trail, which he described as an unpaved "cut-through to Sheridan from North Hawthorne," in previously received exhibits.

Investigator Puglise testified that when he entered side A of the duplex, he saw a hole in the wall by the door, which appeared to be recent damage and to be the scene of a scuffle. He said the other areas of the home did not appear to be in disarray. He smelled a "pretty heavy odor of marijuana."

-5-

Investigator Puglise testified that he interviewed Michael Mosley at the scene. Investigator Puglise said Investigator Francis spoke with Ms. Billups, who lived on Sheridan Avenue. Investigator Puglise said that residents of the duplex were taken to the police department for questioning by Investigator Plumlee, which resulted in the police receiving information about a suspect who was a black male with "short low hair" wearing a turquoise sweater or sweatshirt. He noted that the information was consistent with information he had received previously. Investigator Puglise said that Ms. Billups identified Devante Stoudemire, who was also known as "White Chalk," as a suspect and that she identified a "suspect vehicle."

Investigator Puglise testified that he and Investigator Montgomery interviewed Mr. Stoudemire, who was located by other officers that evening. He said Mr. Stoudemire was released after giving a statement. Investigator Puglise said Mr. Stoudemire stated that he saw a man run from "the cut" and that the man flagged down and got into a white Buick, in which Mr. Stoudemire saw Dustin Hayes. Investigator Puglise stated that he and Investigator Montgomery used Facebook to identify Mr. Hayes, whom he said was white, skinny, and wore his long hair in a ponytail.

Investigator Puglise testified that he and Investigator Fuller interviewed Mr. Hayes at the police department on July 2, 2012. He said Mr. Hayes was released after giving a statement.

Investigator Puglise testified that a fingerprint lifted from the victim's screen door was identified as being the Defendant's. He said that after the Defendant received word on July 3, 2012 that the police wanted to talk to him, the Defendant came voluntarily to the police department, where Investigators Puglise and Fuller interviewed him after the Defendant was advised of and waived his rights. A video recording of the statement and a transcript of the statement were received as exhibits, and the recording was played for the jury.

In the recorded statement, the Defendant stated that he was eighteen years old and a high school graduate. He said he was not employed. The Defendant said he had been "in trouble for some weed last summer" and that he smoked marijuana "[e]very other day or so."

Relative to his activities on July 2, 2012, the Defendant stated in the police interview that he had been in Hixson when he received a call from his sister, who told him that someone had "died down the street." He said that he looked at Facebook but could not find any information about the death and that he did not know who died. When told the victim's name, he stated that he did not recognize it. He acknowledged his familiarity with the area around North Hawthorne Street, Sheridan Avenue, and Wilson Street but said he did not remember having ever been at the victim's address. He said he had been out of town until the previous Friday and since that time had been in Hixson.

He denied being in a white Bonneville, a white sedan, or a white Buick on July 2 and said he had been in a gray Kia that belonged to "C.C.'s sister." He denied that he had driven around with a white, ponytailed male on July 2.

Describing his activities of July 2, 2012, the Defendant stated in the police interview that he had spent the night at Blake Lee's house but forgot to take his clothes. He said he talked to "family" from Humboldt, went downtown to a restaurant, and returned to Mr. Lee's house. He did not know the time he returned to Mr. Lee's house but said it was daytime and was before a rain storm. He said that they got a ride to Hixson and that he received a call from his sister that something had happened "down here." He said that his sister urged him to be safe and that he decided to stay in Hixson with "Kelsey." The Defendant stated that when he woke on July 3, he had "missed calls and stuff" and later learned that the police had been at his house. He said his mother told him that the police were looking for him. He said that his brother picked him up in Hixson and that he went to the police department.

In the police interview, the Defendant denied knowing Mr. Stoudemire but said he had seen him "[a] while back on the news." He denied having ever "kicked it" with Mr. Stoudemire. He also denied having ever been a gang member and having ever owned a gun. He said he probably had ammunition in his room but said there "should not be" any there currently. When shown a photograph, he said had not been with the man depicted in the photograph on July 2, 2012.[1] The Defendant thought he had seen the photograph when the person depicted in it "got in trouble or something out in Brainerd or something" and said he had gone to school with the person. He agreed that the person was known as "White Chalk." He denied any memory of a 2007 incident in which the police interviewed him when he was with Mr. Stoudemire.

The Defendant stated in the police interview that he had handled fireworks at Blake Lee's house on July 2, 2012. He later said he obtained the fireworks from "Kelsey and them" and that he used them in Hixson and Highland Park on July 2. He said Blake Lee's brother, Marcus, lived with Blake Lee.

When shown a photograph that Investigator Fuller stated depicted Dustin Hayes, whom Investigator Fuller stated was white, the Defendant stated in the police interview that the person did not look familiar.

When shown a photograph that Investigator Puglise stated depicted the victim, the Defendant said he did not know the person. He denied having ever seen the victim or having been to the victim's house.

---

[1] Although the person depicted in the photograph was not identified by name in the recorded interview, it is apparent from the context and the reference to the nickname White Chalk that the individual was Devante Stoudemire.

The Defendant stated in the police interview that he smoked marijuana "[e]arly in the morning" on July 2, 2012. He denied that he smoked daily, said he smoked two to four blunts a week, and denied smoking crack cocaine. He said that he did not know where to buy marijuana and that he had someone get it for him. He denied any possibility that he had gone to the victim's house to purchase marijuana. He said that Blake Lee usually procured marijuana for him and that he usually smoked with Mr. Lee.

The Defendant stated in the police interview that he was familiar with the term "hit a lick" because he had heard it in a song and that it meant trying to rob someone. He denied he had ever hit a lick and said he could not get into trouble because he had to take care of his sister.

The Defendant recalled in his police interview that his fingerprints had been taken when he had a previous trespassing citation. When told that his fingerprints had been found on the screen door of the victim's home and that two people who "pretty much knew [him] by name" had seen him there, the Defendant stated that he had not been at the victim's house on July 2, 2012, but that he had been there to purchase a marijuana blunt approximately the previous Saturday.[2] He said that this occasion had been the first time he bought marijuana from the victim and that he found out about the victim from "TaTa," whose given name the Defendant did not know. The Defendant said that the victim sold him the blunt on the front porch and that the Defendant did not go inside the victim's house. The Defendant later said they were in the doorway and that he, not the victim, opened the victim's screen door. He said that he had been alone when he purchased the marijuana and that as far as he knew, the victim was alone, as well. He said that initially, he had not admitted knowing the victim because he "didn't want to get in trouble for smoking weed."

The Defendant stated in his police interview that he did not know the victim's brother. He said he did not know people in the victim's neighborhood and was not familiar with the neighborhood. He said he had asked where to buy marijuana and had been pointed to the victim's door. He denied that he had been on Sheridan Avenue on July 2, 2012. He denied that he had been with Mr. Hayes on July 2. When told that his fingerprints were on Mr. Hayes's white car, the Defendant stated that he probably saw Mr. Hayes at Blake Lee's house but that Mr. Hayes was not familiar because the Defendant did not really know him. The Defendant stated that Mr. Lee knew Mr. Hayes.

In his police interview, the Defendant acknowledged that he had been in Mr. Hayes's car to go to Hixson on July 2. He denied, however, that they had instead gone to pick up Mr. Stoudemire "off 58." The Defendant denied that they went "out east" and

_____

[2] This court knows by reference to a calendar that the Saturday immediately before July 2, 2012 was June 30. *See* Tenn. R. Evid. 201(b)(2), (c).

-8-

parked on Sheridan Avenue, where he walked to Kelsey Billups's house through a "cut" toward North Hawthorne Street. He denied ever being on a path across the street from the victim's house and said he knew nothing about the path. He said that when he was in the area, he walked on the streets. He acknowledged that on July 2, "we" went to the house of a person named Kelsey whose last name he did not know. He said she was Mr. Lee's cousin. He said he did not recall coming back to get in the car and leaving even though he had been identified. He said he stayed at Kelsey's house and did not leave with Mr. Stoudemire and Mr. Hayes. When asked why three spent .38-caliber shell casings were under his mattress at home, the Defendant said that he did not know anything about a .38-caliber gun and that he did not own one. He said his mother's boyfriend, who lived in his household, had a gun but that he did not know what type of gun it was. The Defendant said his mother might have sent the boyfriend into the Defendant's room for something. The Defendant said that Mr. Stoudemire and Mr. Hayes had not been to his house. The Defendant said he had not been home since the previous Friday.

The Defendant stated in the police interview that he did not know why the victim was killed and that he did not shoot the victim. The Defendant denied that he had ever stolen anything. He said he did not sell drugs or commit robberies. He said he had never pawned anything.

When advised that his hands would be tested for gunshot residue, the Defendant said there was no reason that gunshot residue from firing a weapon would be on his hands or clothes. He denied firing a weapon within the last couple of days and said he had only handled firecrackers. He declined to give consent for collection of a DNA sample. He said he wore the same clothes at the time of the interview as he had worn on July 2, 2012.

When asked in the police interview if he bought Natural Light beer on July 2, 2012, the Defendant stated that he did not drink beer. He said he did not know anyone who drank Natural Light.

During the Defendant's recorded police interview, the Defendant's mother and brother entered the room. The Defendant stated that he was being charged with a murder he did not commit. He stated that "shells" had been found under his bed but that he had not been home since Friday and did not know from where they came. He stated that he had been in Hixson all day on July 2, 2012, and that he had visited Kelsey Graham, who was Blake Lee's cousin. He later said he had been in Hixson and Highland Park. The Defendant stated that early on Monday morning, he had dropped off "Peaches" and told her to take him back into the house but had not gone inside. The Defendant's mother questioned him about "the white boy," and the Defendant stated that Mr. Lee knew "Dustin," who had given the Defendant and Mr. Lee a ride on July 2 to Kelsey's house. The Defendant stated that he thought Dustin's car was a white Buick. When asked why the police thought the Defendant had been with "White Chalk" the previous day, the

Defendant stated that he had not been with White Chalk. The Defendant's mother stated that she had allowed the police inside her home and that they had searched it. She said she had consented to a search of the Defendant's room because she did not think the Defendant had done anything.

In the recorded interview, the Defendant stated to his mother and brother that the police had already talked to Blake, Marcus, and Trey. He stated that he had been with them. The Defendant's mother stated that she had talked to "Michelle" and that "they ain't been there," although it was unclear to whom she was referring. The Defendant stated he had been with "them" and that "Ms. Michelle was pulling up" as they were walking from Bi-Lo. The Defendant stated that Ms. Michelle knew he had been at "her" house. At the end of the interview, Investigator Fuller stated that the Defendant would be charged with felony murder and that the Defendant's clothing, which was collected during the interview, would be tested by the Tennessee Bureau of Investigation (TBI) Crime Laboratory.

After the Defendant's recorded interview was played, Investigator Puglise testified that Mr. Stoudemire and Mr. Hayes were interviewed after the Defendant. Investigator Puglise said Mr. Stoudemire and Mr. Hayes were charged with felony murder, as well. He said that after Mr. Hayes's interview, Mr. Hayes went with Investigator Puglise and Investigator Narramore to the location where Mr. Hayes stated that Mr. Stoudemire had taken the shell casings from the homicide from a weapon the Defendant had given Mr. Stoudemire. Investigator Puglise said that Mr. Hayes stated the weapon had been wiped with a bandana and dropped near a stop sign in the area, which was near the intersection of Union Avenue and Greenwood. He said they found three .32-caliber shell casings in a storm drain and that Investigator Salyers was called to photograph the scene and collect the casings. Photographs of the location where the casings were found were received as exhibits. Investigator Puglise identified a house depicted in a photograph exhibit as that of L'Tonya Lemaitre, whom he interviewed at her home that evening.

Investigator Puglise testified that the police searched Blake Lee's home with the assistance of a trained dog but did not find a weapon. He said no weapon had been recovered relative to this case. He said three .38-caliber shell casings were recovered from the Defendant's home.

Investigator Puglise acknowledged that he "[p]robably" lied when he and Investigator Fuller interviewed the Defendant. He agreed that he told the Defendant that the Defendant's fingerprints were found on a car but that they had not been. He said that when Investigator Fuller told him that at least two witnesses had identified him by the name "Little Ronnie," this was partially true. He acknowledged that the police had information from a confidential informant about "Rodney G.," which he assumed "was a mixup on the name because of the similarities." He said that when they interviewed the Defendant, they "just basically were going off his fingerprint" at the victim's home. He

agreed that the .38-caliber shell casings from the Defendant's house were unrelated to the victim's homicide. When asked about evidence to support the robbery charge, Investigator Puglise stated that witnesses said signs of a struggle existed, that Mr. Stoudemire told him that "he was going to get marijuana and money," and that Mr. Stoudemire stated that Mr. Stoudemire "was going to get his score." Investigator Puglise stated that Mr. Hayes also told the police "that that was the motive."

Investigator Puglise agreed that Mr. Hayes took them to the location where the .32-caliber shell casings were recovered following the third interview in two days. He agreed they went to the location at 11:50 p.m. He agreed that Mr. Hayes was released between interviews.

Chattanooga Police Crime Scene Unit Investigator Jerry McElroy testified that he, Investigator Brian Rodgers, and Investigator Caleb Brooks collected and processed evidence related to this case. Investigator McElroy stated that upon arriving at the scene of the homicide, he learned from Officer Seiter that the victim had been involved in an altercation inside or just outside Side A of the duplex, ran inside Side B, and collapsed. Investigator McElroy said the victim was identified from information inside the victim's wallet. He received two cell phones from Investigator Morrison. He said that the scene was photographed and that two video recordings depicting the scene were made. The photographs were received as exhibits. He identified the photographs depicting the victim's body as it was found on Side B. He said he collected samples of what appeared to be blood underneath the victim's body and on the wall near the body. He said they collected hairs from the back of the victim's shirt. He said Investigator Brooks collected a gunshot residue (GSR) kit from the victim.

Investigator McElroy testified that he did not see signs of forced entry on Side A. He said he swabbed the door handles on the victim's screen door and interior door for DNA evidence. He noted that the sheetrock near the victim's front door appeared to have been "pushed in or struck by something." He stated that he collected the following items from a coffee table and a recliner in the victim's living room: a cigarillo package, a water bottle, a tobacco grinder, a cigarette butt, and a lighter. He said cigarette butts from elsewhere in the home were collected. He said that as a result of a search using a trained dog, the police recovered a bag of what was suspected to be marijuana from a compartment in the victim's living room recliner, a set of digital scales, and a larger bag of marijuana from inside a pocket on an item of clothing.

Investigator McElroy testified that he collected an unopened can of beer and a Newport cigarette pack from a trail that ran west from North Hawthorne Street toward Sheridan Avenue. He also collected a glass pane that was outside Side A of the duplex. He identified photographs of the trail, the beer, the cigarette pack, and the glass pane. He said no fingerprints were recovered from the glass pane. He said he processed Side B for fingerprints but did not know if the Automated Fingerprint Identification System (AFIS)

investigators made an identification from the fingerprints he lifted. He said he collected five fingerprints from the inside of the screen door on Side A. The log of fingerprints collected was received as an exhibit.

Investigator McElroy testified that he collected a buccal swab and a GSR kit from Mr. Stoudemire after 1:00 p.m. on July 3, 2012. He said he collected a buccal swab, a GSR kit, and "major case prints" from Mr. Hayes around 5:30 p.m. on that date. He said that Mr. Stoudemire and Mr. Hayes were photographed and that Investigator Salyers collected their clothing. He said he received from the medical examiner's office three projectiles, the victim's clothing, and a "DNA blood spot" from the victim's body.

Investigator McElory identified photographs of the Defendant taken on July 3, 2012, which were received as exhibits. One of the photographs depicted what appear to be abrasions on the Defendant's right hand. Investigator McElroy identified the clothing collected from the Defendant as a pair of black Adidas shoes, black socks, black exercise pants, blue Starter shorts, and a black Savvy t-shirt. He said a buccal swab and a GSR kit were collected from the Defendant. The clothing, buccal swab, and GSR kit were received as exhibits. He identified photographs of the Defendant's house and the .38-caliber shell casings recovered inside the house, and the photographs and shell casings were received as exhibits.

Investigator McElroy testified that he processed a white, four-door Buick Park Avenue on July 3, 2012. He said he lifted fingerprints, which he also photographed, from the Buick. The photographs were received as exhibits. He identified the .32-caliber shell casings that were recovered from the storm drain, and they were received as exhibits. He said that two of the casings were .32-caliber RB shell casings and that the other was a .32-caliber Aguila 7.65 millimeter shell casing.

Chattanooga Police Sergeant David Franklin, a latent fingerprint examiner in the AFIS division and expert in latent fingerprint analysis, testified that he compared the latent fingerprints collected in this case against the AFIS computer database of latent fingerprints. He described the process he followed in conducting latent fingerprint analysis. He said that four latent fingerprints from the Buick were matched to Mr. Hayes, that two matched a person named Bryant, and that another was unidentified. Regarding a fingerprint from Side B of the duplex, he determined that it was not made by Mr. Hayes, Mr. Stoudemire, or Bryant. He said that he could not exclude the Defendant, "Dunham," and the victim and that the print remained unidentified. Regarding latent fingerprints from outside the screen door on Side A of the duplex, he said that two matched Cassandra Dunham. He said that three latent prints lifted from inside the screen door on Side A were not matched to anyone and that three other latent prints matched the Defendant's known fingerprints. Regarding the unmatched prints, he said that the Defendant, Mr. Hayes, Mr. Stoudemire, and Bryant were excluded as having left the fingerprints. He said his findings regarding the matched fingerprints were confirmed by

-12-

another fingerprint examiner. He said that the latent prints from Side A that he identified as the Defendant's were high-quality prints and that fingerprint quality could dissipate over time. He acknowledged, however, that he did not know when the Defendant's fingerprints were made.

Dustin Hayes testified that he was charged with first degree felony murder and had pleaded guilty to facilitation of aggravated robbery relative to the events that formed the basis of the Defendant's charges. He acknowledged that he had agreed to a six-year sentence but had not yet been sentenced. He also acknowledged that the sentencing court would consider diversion. He acknowledged that the plea agreement included in its terms a provision that he would testify truthfully in any proceedings involving the Defendant and Mr. Stoudemire relative to the victim's homicide and that he would cooperate with officials from law enforcement and the district attorney's office. He said he had been in custody for just under three years relative to this case.

Mr. Hayes testified that he was twenty-one years old and that he had known the Defendant since they were fifteen years old. He said he called the Defendant "Ronnie." Mr. Hayes testified that he had known Mr. Stoudemire since Mr. Hayes was fifteen years old but that they had only met once and that they did not "hang out." He said they were friends on Facebook. Mr. Hayes said that Blake Lee was a good friend and that Mr. Lee knew the Defendant. Mr. Hayes identified Haven Lee as Mr. Lee's younger sister.

Mr. Hayes testified that in July 2012, Mr. Lee lived in a house at Eighteenth and Watauga with Mr. Lee's mother, brother, and sister. Mr. Hayes said that he spent Saturday, June 30 and Sunday, July 1, 2012 at Mr. Lee's house.[3] He said he had driven the Defendant and Mr. Lee to "random places," including fast food restaurants, in Mr. Hayes's grandmother's 1991 white Buick Park Avenue. He said that at some point, which he thought was on Sunday, when they drove on North Hawthorne Street toward Mr. Lee's house, the Defendant "mentioned the knowledge of a house there that would be available to rob." Mr. Hayes did not recall exactly what the Defendant said but stated it was something about the Defendant's knowing that a robbery occurred at the house or that someone had told the Defendant about a robbery at the house. Mr. Hayes said the Defendant did not describe the person who lived at the house.

Mr. Hayes agreed that he, the Defendant, and Mr. Lee went to Mr. Lee's house and stayed overnight on Sunday, July 1, 2012. Mr. Hayes said that on July 2, they woke, smoked marijuana, watched a movie, and played video games. He said, though, that Mr. Lee left with his girlfriend, Tiara, while he, the Defendant, Marcus Lee, and possibly Haven Lee watched the movie. Mr. Hayes said that during the morning, the Defendant

---

[3] This court takes judicial notice via reference to a 2012 calendar that June 30 and July 1 were the Saturday and Sunday immediately before Monday, July 2, 2012. *See* Tenn. R. Evid. 201(b)(2), (c).

began asking for a ride. Mr. Hayes stated that he knew the Defendant wanted to commit a robbery and that this was probably the reason the Defendant wanted a ride. He said he delayed because he did not want to give the Defendant a ride. Mr. Hayes said the Defendant wore a blue or turquoise Angry Birds shirt and dark shorts and that Mr. Hayes also wore an Angry Birds shirt that day.

Mr. Hayes testified that he eventually gave the Defendant a ride and that the Defendant directed Mr. Hayes to drive on Highway 58. Mr. Hayes said the Defendant wanted to go to a friend's house, where the Defendant wanted "to pick up some heat," referring to a weapon. Mr. Hayes said the Defendant directed him to an apartment complex, where Mr. Stoudemire entered the car. Mr. Hayes said an older woman, whom he thought was a mother or an aunt, had been talking to Mr. Stoudemire. Mr. Hayes said that when Mr. Stoudemire asked, "What's up," the Defendant "said something about a lick that we were going to go hit," referring to committing a robbery or burglary. Mr. Hayes said Mr. Stoudemire responded "with approval toward it." Mr. Hayes said that the Defendant directed him to drive toward East Chattanooga and that they ended up at North Hawthorne Street, where Mr. Stoudemire directed him to a different street than "the actual scene," which Mr. Hayes later learned was Sheridan Avenue. Mr. Hayes said that Mr. Stoudemire saw someone he knew and asked Mr. Hayes to stop beside the house. Mr. Hayes said that Mr. Stoudemire took out a dark-colored revolver and passed it to the Defendant. Mr. Hayes said that the Defendant and Mr. Stoudemire got out of the car, that Mr. Stoudemire went to talk to some women who were standing near the house, and that the Defendant disappeared into a "cut." Mr. Hayes said he used his cell phone while he waited for the other men to return.

Mr. Hayes acknowledged that when the other men left, he knew a robbery was about to occur. He thought that money and marijuana would be obtained via the robbery. He based his opinion on a statement the Defendant made that the intended target was a "weed man." Mr. Hayes said that after a few minutes, he heard three loud bangs. He said Mr. Stoudemire yelled, "fireworks," which Mr. Hayes assumed was meant to be a distraction. Mr. Hayes said that within a few minutes, the Defendant returned through the cut and got into the car. Mr. Hayes said the Defendant told him to "go." Mr. Hayes said that as he began to drive, Mr. Stoudemire arrived and got into the car. Mr. Hayes said that the Defendant told him where to drive.

Mr. Hayes testified that the Defendant stated that things had gone wrong. Mr. Hayes said the Defendant stated that the victim attacked him, tried to grab the gun, and picked up the Defendant. Mr. Hayes said the Defendant stated he shot the victim in order to get the victim off him. Mr. Hayes said they went to a house with a thin, average-height black woman on the porch, where the Defendant went inside. Mr. Hayes said that Mr. Stoudemire showed him a bandana containing shell casings and that Mr. Stoudemire walked to a stop sign about ten feet ahead and "proceeds to kind of wipe [the casings] under his belt with the bandana." Mr. Hayes said he later learned Mr. Stoudemire had

dropped the casings into a drain at that location. Mr. Hayes said the Defendant returned to the car.

Mr. Hayes testified that they went to Twelfth or Eighteenth Street at Mr. Stoudemire's direction. Mr. Hayes said that Mr. Stoudemire and the Defendant had a conversation about obtaining replacement bullets for the gun, but Mr. Hayes did not know if someone at the house had bullets or a connection to bullets. Mr. Hayes said that during this conversation, the Defendant said something like, "I thought you had a .38." Mr. Hayes said that at some point, the Defendant spoke on his cell phone about the robbery and that the other person appeared to have been aware of what was supposed to occur. Mr. Hayes said the Defendant made a statement about knowing that no one was supposed to get hurt but that he had to "burn" the victim, meaning he had to shoot the victim. Mr. Hayes said that the other men got out of the car and went to the porch when they reached the house. Mr. Hayes said that after a few minutes, he was hot and went to the porch for water. He said he heard Mr. Stoudemire say something like "s--- went bad." Mr. Hayes said that after a few minutes, they left to go to Mr. Lee's house.

Mr. Hayes testified that Mr. Lee was at the house or arrived shortly after Mr. Hayes arrived with Mr. Stoudemire and the Defendant. Mr. Hayes said that Mr. Lee knew about the robbery. Mr. Hayes said that Mr. Stoudemire received a telephone call and that afterward, Mr. Stoudemire told the Defendant that Mr. Stoudemire's name had been mentioned in connection with a shooting and that the person who mentioned Mr. Stoudemire's name had seen someone in a blue shirt get out of the car and "disappear." Mr. Hayes said that he asked Mr. Stoudemire if Mr. Hayes's name had been mentioned and that Mr. Stoudemire said he did not think it had. Mr. Hayes said that at some point after they returned to Mr. Lee's house, he took Mr. Stoudemire to a location a few blocks away. Mr. Hayes stated that as they arrived at the location, Mr. Stoudemire said that if Mr. Hayes were questioned by the police, Mr. Hayes should say, "I don't know him, I don't know Ronnie and I don't know s---." Mr. Hayes said he returned to Mr. Lee's house.

Mr. Hayes testified that a few hours later, a male friend of Mr. Lee's named CeeCee or DeeDee or something similar took them downtown to "hang out" in a large vehicle. He said that it began raining downtown, that they went to Walmart for Mr. Lee to pay his cell phone bill, and that they returned to Mr. Lee's house around 8:00 p.m. Mr. Hayes said he drove Mr. Lee and the Defendant to Kelsey's house in Hixson. Mr. Hayes said he stayed at Kelsey's house for a few minutes but left alone and went to his house on Forest Dale in Hixson.

Mr. Hayes testified that at his request, Sharika Moon came to his house that evening. He stated that he confided in her that he thought he had been involved in a murder. He said his uncle came to his bedroom door at this point and told him that the police were at the house asking for him. He said the police took him to the police

department and wanted to interview him. He said that he initially declined to talk to the police and requested a lawyer, that he was shackled and handcuffed to furniture for several hours, and that he was told he was going to jail. He said he changed his mind about talking to the police after seeing Mr. Stoudemire "very happy looking" and walking out of the police department.

Mr. Hayes testified that because he had seen Mr. Stoudemire at the police department, he thought he could say he had been with Mr. Stoudemire but that he did not want to admit he had been with the Defendant. Mr. Hayes stated that he told the police he had given a ride to "some guy with an R in his name." He said the police supplied the name Rodney and that he asked, "Who is Rodney?" Mr. Hayes said the police told him Mr. Stoudemire told them that Rodney had been with them and that Mr. Hayes agreed with them and told them that he thought "Rodney did it." Mr. Hayes said he tried to distance himself "as much as possible." Mr. Hayes stated, however, that at the time of the trial, he knew that the person had not been Rodney or Rodney G. He said he had gone along with what the police represented as Mr. Stoudemire's statement because he thought Mr. Stoudemire would not get mad or hurt him if he was consistent with what Mr. Stoudemire had told the police. He said that he never gave the Defendant's name to the police and that he was released.

Mr. Hayes testified that after he was released, Mr. Lee called him. Mr. Hayes stated that he told Mr. Lee the same version of events he had provided to the police and that the police said Rodney had killed someone. Mr. Hayes said the Defendant called him and that he later returned the call and told the Defendant "that some guy named Rodney did something" in order to communicate that Mr. Hayes had not implicated the Defendant. Mr. Hayes stated that he did not talk to Mr. Stoudemire before or after he was taken to the police department. Mr. Hayes said the telephone call with the Defendant was the only conversation he had with the Defendant on July 3, 2012.

Mr. Hayes testified that his grandmother called him on July 3, 2012 while he was at Kadijah's house and told him the police were looking for him. He said he went home, where the police were waiting to transport him to the police department. He said he gave another statement. Mr. Hayes stated that he initially denied knowledge of the relevant events but that he progressively provided more information. He said that because he had been afraid to admit he had seen a gun, he told the police it had been "wrapped up." He said he told the police about the statements he heard the Defendant make about having to burn someone because the person fought back. He said he told them about having seen Mr. Stoudemire wipe off the shell casings and throw them down in front of a stop sign. He agreed to take the police to the location where the shell casings were dropped. He said he cooperated with the investigation and that at this point, he had not been offered a plea agreement and did not have an attorney.

Mr. Hayes admitted that he knew when he drove to Sheridan Avenue and North Hawthorne Street that a robbery was going to occur but said it had not been his idea and that he did not know the victim. He said he had not known the victim was going to be hurt.

On cross-examination, Mr. Hayes acknowledged that in the interviews, he just agreed with all of the facts provided by the police. He agreed that the police threatened him repeatedly with charges to the crimes that he was ultimately charged with committing. He acknowledged that in his third statement, he agreed that Ronnie, not Rodney, participated. Mr. Hayes acknowledged that he never told the police that he, the Defendant, and Mr. Lee "took a ride on Hawthorne on Sunday and drove on Hawthorne" and stated that he told the prosecutors one week before the trial, which he said was the first time he spoke to them. Mr. Hayes acknowledged his chest tattoo, which stated "Thugs never change."

L'Tonya Lemaitre testified that she lived on Greenwood and that she knew the Defendant, his mother, Rachel, and his sister, Sarabi. She had known the family for about fifteen years and met them when she lived in Boone Height. She said she knew who Blake Lee was but was unaware that he was the father of Sarabi's child.

Ms. Lemaitre testified that the police came to her house but did not recall the date. She said that earlier on the same day, the Defendant had come to her house to get some water and to visit. She said it had been hot that day. She said the Defendant left in a light-colored car with two other individuals. She said she could not tell the other individuals' race but thought she saw "dreads." She acknowledged that about two and one-half weeks before the trial, she told the prosecutors that one individual was white and the other was black and had dreads. She said, however, that she did not know if the first individual was light-skinned.

TBI Special Agent Forensic Scientist Chad Johnson, an expert in forensic biology and serology, testified that his analysis of swabs of the floor and wall from the crime scene revealed that the swabs contained DNA that matched the victim's profile. He said that he had been unable to obtain a complete profile from a swab of a door handle. He said that he tested the Defendant's shirt and pants and did not find the presence of blood. He said, however, that testing on a stain on the Defendant's shorts revealed the presence of blood. He said the stain contained a mixture of DNA from at least two individuals. He said the testing was inconclusive relative to whether the mixture contained the victim's DNA.

TBI Special Agent Forensic Scientist James Russell Davis II, an expert in trace evidence, testified that he analyzed gunshot residue kits collected from the Defendant, the victim, Mr. Hayes, and Mr. Stoudemire. He said the results were inconclusive as to

whether the victim had fired, handled, or been near a gun when it was fired. He said the results were negative as to the Defendant, Mr. Hayes, and Mr. Stoudemire.

Agent Davis testified that he also analyzed clothing for gunshot residue. He found no gunshot primer residue on the clothing collected from Mr. Stoudemire and Mr. Hayes. He found no gunshot primer residue on the Defendant's shirt and pants, but he found gunshot primer residue on the left front area of the Defendant's shorts. He said that he had not encountered fireworks that contained the three elements present in gunshot primer residue and that the material he found on the shorts lacked other elements that were almost always present in fireworks. From this finding, he concluded that the clothing had been near a weapon when it was fired or that it came into contact with a recently fired weapon, a fired cartridge case, or a person's hands that contained gunshot residue.

Agent Davis acknowledged that he was unable to determine the age of the gunshot residue he found or the type of ammunition from which it came. He said that the amount of time gunshot residue remained on clothing depended on the wearer's activity. He said it was possible for gunshot residue to transfer to a person's clothing even though the person had not fired a gun but had been near a weapon as it fired.

TBI Special Agent Forensic Scientist Teri Arney, an expert in firearms identification, testified that she examined the three cartridge cases recovered from underneath a mattress at a residence on Wheeler Avenue and determined that they were .38 special caliber and had all been fired from the same weapon. She was not given a weapon with which to compare them. She examined the cartridge cases that other evidence showed were the ones recovered from the storm drain and determined that they were ".32 auto caliber cartridge cases" and that they were fired from the same weapon. She said that the .38-caliber cartridge cases and the .32-caliber cartridge cases had been fired from two different weapons. Regarding the .32-caliber cases, she said two were Remington brand and the other was Aguila brand. She examined the bullets recovered from the victim's body and determined that they were .32 caliber and that all three had been fired from the same weapon. She said that the rifling present on the bullets was consistent with the characteristics of ammunition manufactured by Remington and Aguila. She also determined that the jackets for two of the bullets were the same type and were consistent with Remington brand ammunition. She said the jacket of the third bullet was different from the other two and was consistent with Aguila brand ammunition. She said that without a firearm for comparison, bullets and cartridge cases could not be matched. She said she searched a TBI database and determined, however, that the bullets could have been fired from a revolver from the following manufacturers: H&R, Iver Jonson, Llama, and Smith & Wesson. She said she attempted to fire .32-caliber automatic cartridges from three .32-caliber Smith & Wesson revolvers in the TBI's reference collection, but she did not examine the bullets. She said that two of the cartridges fired, and the revolvers cycled manually after these firings. She said that the

third attempt resulted in a shallow firing pin impression but that the cartridge did not fire. She said the purpose of this experiment was to see whether ammunition of this type would fire from a revolver.

The defense did not present any proof. The jury found the Defendant guilty of the charged offenses of first degree felony murder and attempted especially aggravated robbery. This appeal followed.

# I

## Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support the convictions because the State failed to provide adequate corroboration of Mr. Hayes's testimony in various respects. The State contends that it provided adequate corroboration and that the evidence is sufficient to support the convictions. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

"An accomplice is defined as a person who knowingly, voluntarily and with common intent unites with the principal offender in the commission of the crime." *State v. Anderson*, 985 S.W.2d 9, 16 (Tenn. Crim. App. 1997) (citing *State v. Perkinson*, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992)). "[A] conviction may not be based solely upon the uncorroborated testimony of an accomplice." *See, e.g.*, *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001); *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994); *Monts v. State*, 379 S.W.2d 34, 43 (Tenn. 1964), *overruled on other grounds by State v. Collier*, 411

S.W.3d 886 (Tenn. 2013). In order for accomplice testimony to be adequately corroborated:

> there must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Bigbee*, 885 S.W.2d at 803 (quoting *State v. Gaylor*, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992) (citations omitted)); *see Shaw*, 37 S.W.3d at 903.

Regarding the question of whether a person is an accomplice,

> The term "accomplice" does not include a person who has guilty knowledge, or is morally delinquent, or who was even an admitted participant in a related but distinct offense. To constitute one an accomplice, he must perform some act or take some part in the commission of the crime or owe some duty to the person in danger that makes incumbent on him to prevent its commission. An accomplice is "one culpably implicated in, or who unlawfully co-operates, aids, abets, or assists in, the commission of the crime charged."

> The generally accepted test as to whether a witness is an accomplice is whether he himself could have been convicted for the offense, either as principal or accessory.

*Pennington v. State*, 478 S.W.2d 892, 898 (Tenn. Crim. App. 1971) (quoting 2 Wharton's Criminal Evidence § 448 (12th ed. 1955)). A person is not deemed an accomplice simply because he or she was present at the crime scene. *Letner v. State*, 512 S.W.2d 643, 647 (Tenn. Crim. App. 1974); *Hicks v. State*, 149 S.W. 1055, 1056 (Tenn. 1912).

## A. <u>First Degree Felony Murder</u>

As relevant to the present case, first degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" T.C.A. § 39-13-202(1)(2) (2014). Especially aggravated robbery "is the intentional or knowing theft of property from the person of another by violence or putting the person in fear"

which is "[a]ccomplished with a deadly weapon" and in which "the victim suffers serious bodily injury." *Id.* §§ 39-13-401(a) (2014), -403(a)(1)-(2) (2014). A defendant commits criminal attempt when he acts "with the kind of culpability otherwise required for the offense . . . [and] [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" T.C.A. § 39-12-101(a)(2).

Viewed in the light most favorable to the State, the evidence shows that the day before the crimes occurred, Mr. Hayes, Mr. Lee, and the Defendant were driving in the vicinity of the victim's house when the Defendant made statements that he knew of a house where a robbery could be committed. On July 2, 2012, the Defendant began asking for a ride, and Mr. Hayes knew the Defendant wanted to commit a robbery. As Mr. Hayes drove the Defendant to a location the Defendant requested, the Defendant stated he wanted to "pick up some heat," and the Defendant later made a statement to Mr. Stoudemire about "a lick that we were going to go hit." The Defendant also made a statement that his intended target was a "weed man." When they reached the area of the victim's house, Mr. Stoudemire gave the Defendant a gun, and the Defendant left the car and disappeared into a "cut." The victim was shot, and his house showed signs that a struggle occurred. Ms. Swanson, who lived on the other side of the duplex in which the victim lived, heard a struggle next door, looked into the victim's home and saw two people "tussling" with a revolver, and the victim came to her home and collapsed in her living room. Mr. Hayes said the Defendant wore a blue or turquoise Angry Birds shirt and dark shorts on July 2. Ms. Billups testified that the person she saw on the cut that day wore a "turquoise blue" shirt with designs and black or navy shorts, and she identified the person as the Defendant. The blue shorts collected from the Defendant at the police department contained blood and gunshot residue.

The evidence shows, as well, that the .32-caliber bullets recovered from the victim's body were consistent with the cartridge cases Mr. Hayes saw the Defendant give Mr. Stoudemire, which Mr. Stoudemire dropped into a storm drain, and which were later recovered when Mr. Hayes led the police to them. The cartridge cases from the storm drain were .32 caliber, two of Remington manufacture and one of Aguila manufacture. Although the bullets from the victim's body could not be identified by manufacturer, the rifling on them was consistent with rifling on ammunition manufactured by Remington and Aguila. Mr. Hayes described having seen Mr. Stoudemire give the Defendant a revolver, and Ms. Swanson said the gun with which she saw two people tussling inside the victim's home was a revolver. Agent Arney testified that she successfully test fired two of three rounds of .32-caliber automatic ammunition, which was the type of the cartridge cases from the storm drain, from three .32-caliber revolvers. Mr. Hayes testified that the Defendant told Mr. Stoudemire that the victim resisted and that the Defendant shot the victim to get the victim off him. In his pretrial statements, the Defendant initially denied he had ever been to the victim's house but, after he was confronted with the information that his fingerprints had been found there, he admitted he

had been to the victim's house two days before the offenses to purchase marijuana. The Defendant initially denied knowing Mr. Hayes but later admitted he had been with Mr. Hayes on the day of the crimes.

Regarding the question of whether Mr. Hayes's testimony was adequately corroborated, we note, first, that Mr. Hayes qualified as an accomplice. Knowing that the Defendant wanted to commit a robbery, Mr. Hayes drove the Defendant to pick up a gun and to the location the Defendant specified. Mr. Hayes waited while the Defendant went to the victim's house, and Mr. Hayes drove the Defendant away when the Defendant returned to the car. Mr. Hayes also drove to the location where Mr. Stoudemire disposed of the cartridge cases the Defendant gave Mr. Stoudemire after the crimes.

Regarding the corroboration itself, we note Ms. Billups's identification of the Defendant as the black man in the passenger side backseat of the car driven by Mr. Hayes and also containing Mr. Stoudemire. Her description of the Defendant's clothing was consistent with that provided by Mr. Hayes, and the Defendant's shorts collected by the police were consistent with Ms. Billups's description of navy or black shorts on the person who ran from the scene. The clothing contained blood and gunshot residue, and the Defendant stated in his pretrial interview that the clothing the police collected were the ones he wore on July 2, 2012, the date of the victim's homicide. Mr. Hayes testified that the Defendant wanted to rob the "weed man," and Ms. Billups and the victim's brother testified that the victim sold marijuana. Ms. Swanson did not know if the victim sold marijuana regularly but had purchased a blunt from him. The Defendant initially denied knowing the victim but, when confronted with the fingerprint evidence tying him to the victim's home, admitted that he bought marijuana from the victim. The Defendant also admitted that he had been with Mr. Hayes on the day of the crimes. Mr. Hayes testified that the Defendant stated he had struggled with the victim before shooting the victim, and damage to the victim's home was consistent with a struggle having occurred. No evidence suggested that Mr. Hayes was at the victim's house and thus would have known about the struggle and the attendant property damage except from the Defendant's account of the crimes. The corroborative evidence fairly and legitimately connects the Defendant with the crime and includes evidence that establishes his identity. *See Bigbee*, 885 S.W.2d at 803. The State provided adequate corroboration of Mr. Hayes's testimony.

In so holding, we have considered the Defendant's contention that, aside from Mr. Hayes's testimony, no proof exists to show that the Defendant took or attempted to take anything from the victim. He acknowledges the supreme court's holding in *State v. Bishop*, 431 S.W.3d 22, 48 (Tenn. 2014), which states that, as regards the offense of felony murder, "the *corpus delicti* of the crime is the crime-induced death of the victim, not the underlying or predicate felony." Nevertheless, he argues that the *Bishop* holding should not apply in cases involving corroboration of an accomplice's testimony. The

State argues that, pursuant to *Bishop*, corroboration of the evidence establishing the predicate felony is not required.

*Bishop* involved the use of a defendant's extrajudicial statement as evidence. *Bishop* adopted the modified trustworthiness standard for evaluating corroborating evidence relative to an extrajudicial confession. The *Bishop* court expressly stated that its holding did not change the existing rule that "the *corpus delicti* of a felony murder does not include the predicate felony." *Id.*; *see State v. Shepherd*, 902 S.W.2d 895, 901 (Tenn. 1995).

Notwithstanding this express pronouncement in *Bishop*, the Defendant invites this court to interpret *Bishop* as requiring that, "in the context of an accomplice's accusation, the State must still corroborate the existence of a predicate felony." We reject the Defendant's argument. *Bishop*'s statement relative to the *corpus delicti* of felony murder not including the predicate felony is an accurate statement of a general proposition of law, and nothing in *Bishop* suggests that the supreme court intended to limit the general rule's application solely to cases involving corroboration of a defendant's extrajudicial statement. As we have determined, the State provided adequate corroboration of Mr. Hayes's testimony. Corroboration of his testimony about the predicate felony, specifically, was not required in view of the adequate corroboration the State provided relative to other points of his testimony which implicated him in the felony murder. The Defendant is not entitled to relief on this basis.

## B. <u>Attempted Especially Aggravated Robbery</u>

The Defendant contends that the evidence is insufficient to support the attempted especially aggravated robbery conviction because the State failed to provide adequate corroboration of Mr. Hayes's testimony. The State counters that it provided adequate corroboration of Mr. Hayes's testimony relative to the attempted especially aggravated robbery conviction. We agree with the State that it provided adequate corroboration and conclude that the evidence is sufficient to support the attempted aggravated robbery conviction.

As we have reviewed in detail in the previous section, Mr. Hayes testified about the Defendant's desire to rob a "weed man" and about the Defendant's statement that he had to shoot the victim when the victim resisted physically. The State corroborated Mr. Hayes's account in significant respects: Ms. Billups and the victim's brother testified that the victim sold marijuana. Although the Defendant initially denied knowing the victim, when confronted with fingerprint evidence showing the Defendant had been at the victim's house, the Defendant admitted knowing the victim and buying marijuana from him two days before the crimes. Ms. Swanson testified about hearing and seeing a struggle between two individuals inside the victim's home. She saw a revolver, which was the type of gun Mr. Hayes saw Mr. Stoudemire give the Defendant. A TBI agent

testified that the .32-caliber cartridge cases recovered from a storm drain after Mr. Hayes identified their location could have been fired from a revolver. Damage to the victim's house was consistent with a struggle having occurred, and the victim's brother testified that the damage had not been there when he visited the victim's home two days before the crimes. Ms. Billups identified the Defendant and Mr. Stoudemire as having been in a car driven by Mr. Hayes. She also identified the Defendant as having gone on a trail near the victim's house and having returned from it shortly before the men left the scene. She described the Defendant's clothing consistently with Mr. Hayes's description. The shorts the police collected from the Defendant were consistent with Ms. Billups's description of the navy or black shorts worn by the person on the path and with Mr. Hayes's description of the Defendant's wearing dark shorts. The shorts the police collected contained blood and gunshot residue, and the Defendant told the police they were the ones he wore on July 2, 2012, the date of the victim's homicide. This evidence both corroborates Mr. Hayes's testimony regarding an attempted especially aggravated robbery and the Defendant's identity as the perpetrator of the crime.

The evidence is sufficient to support the convictions. The Defendant is not entitled to relief on this basis.

## II

## Unreliable Identification Evidence

The Defendant contends that he was deprived of due process by the trial court's admission of Ms. Billups's identification of the Defendant as the person she saw in the white car and on the "cut" on the day of the crimes. He argues that her identification was unreliable and therefore inadmissible. The State contends that the Defendant waived appellate review of the issue by failing to object to Ms. Billups's testimony identifying the Defendant by name as the person she saw on the path between Sheridan Avenue and North Hawthorne Street and by failing to raise the issue in the motion for a new trial. The State further contends that the Defendant has not demonstrated that he is entitled to plain error relief.

The Defendant filed a pretrial motion in limine in which he requested permission to conduct a *voir dire* examination of Ms. Billups before she testified. He sought to exclude any identification testimony she might offer which was "not based upon her independent recollection." The Defendant claims in his brief, "The motion was resolved by the State agreeing to allow Counsel to interview Ms. Billups in their office the day before trial," although the record contains no evidence of the resolution of the motion aside from Ms. Billups's acknowledgment on cross-examination that she had spoken previously with defense counsel. The Defendant also makes allegations in his brief regarding the substance of his alleged pretrial interview of Ms. Billups. This court is limited, however, to consideration of evidence that is contained in the appellate record.

T.R.A.P. 13(c). Allegations in pleadings or a party's brief are not evidence that is before an appellate court for review. *See, e.g.*, *Threadgill v. Board of Prof'l Resp.*, 299 S.W.3d 792, 812 (Tenn. 2009), *overruled on other grounds by Lockett v. Board of Prof'l Resp.*, 380 S.W.3d 19, 28 (Tenn. 2012); *State v. Draper*, 800 S.W.2d 489, 493 (Tenn. Crim. App. 1990); *State v. Roberts*, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988).

In any event, the Defendant did not object to or move to strike Ms. Billups's testimony at the trial, and defense counsel conducted a detailed cross-examination of her regarding her identification of the Defendant as one of the three people she saw in the white car on July 2, 2012. She acknowledged that, although she had known Devante Stoudemire by name on July 2, she had not known the names of the driver or the person she later identified as the Defendant. She also acknowledged that the police had not shown her a photograph lineup or other photographs and that she had not testified at the preliminary hearing. She stated that she heard the name "Little Ronnie" in the neighborhood and that she found out the Defendant's name through the legal proceedings. She acknowledged a previous statement to defense counsel that the person she saw was 5'3" to 5'8", and she testified that person had worn a "turquoise blue" t-shirt with "designs" and black or navy shorts. In his closing argument, defense counsel argued that Ms. Billups's testimony had not been credible regarding her in-court identification of the Defendant.

The Defendant did not raise an issue alleging a due process issue or evidentiary error regarding Ms. Billups's identification of him in the motion for a new trial. In his allegation in the motion for a new trial that the verdict was against the weight of the evidence, he stated, "The state's failure to have witness Cheryl [Billups] identify the defendant in court means that the only evidence placing the defendant at the crime scene at the time of the crime is co-defendant Dustin Hayes." This issue relates to the weight and sufficiency of the evidence, however, and not to the admission or exclusion of evidence. The Defendant's issue related to the admission of Ms. Billups's identification of the Defendant is waived. *See* Tenn. R. Evid. 103(a)(1) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected and . . . [i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection if the specific ground was not apparent from the context[.]"); T.R.A.P. 3(e) (stating that in cases tried by a jury, no issue regarding error in admitting or excluding evidence shall be considered by an appellate court if the issue was not specifically stated in a motion for a new trial and that issues which were not preserved in this manner are waived); *see also* T.R.A.P. 36(a) (stating "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). Our review is limited to determining whether the Defendant is entitled to plain error relief.

To that end, we have considered the relevant law regarding plain error review and due process claims relative to eyewitness identification. *See, e.g.*, *Neil v. Biggers*, 409 U.S. 188 (1972) (due process protection from admission of evidence related to suggestive eyewitness identification procedures); *State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (plain error). We conclude that the Defendant has not demonstrated that plain error relief is required. He is not entitled to relief on this basis.

## III

### Correction of Attempted Especially Aggravated Robbery Judgment

As a matter of plain error, we note that the judgment for attempted especially aggravated robbery contains only a partial name of the offense and lists the statutory citation as "39130403." Clerical mistakes in judgments may be corrected at any time. Tenn. R. Crim. P. 36. We vacate the especially aggravated robbery judgment and remand the case to the trial court for entry of a judgment that contains the complete name of the offense and the appropriate reference to Tennessee Code Annotated section 39-13-403.

In consideration of the foregoing and the record as a whole, the first degree felony murder judgment of the trial court is affirmed. The attempted especially aggravated robbery conviction is affirmed, and the case is remanded for entry of a corrected judgment.

_____
ROBERT H. MONTGOMERY, JR., JUDGE